I would like to reserve 5 minutes of my time for rebuttal. We are asking this court to reverse the district court and enter a full judgment in favor of defendant. This appeal presents multiple issues, but the most glaring question is when two parties to a services contract both testify that they never agreed to a rate increase, they had discussions only, can a reasonable jury conclude, we don't really care what the testimony showed, we think there was an oral contract to a rate increase? Well, would the absence of a price in the contract under Louisiana law defeat the contract or could the law provide a price? It could provide a price if there is a missing price. Here, there was not a missing price because they agreed that they would continue their current relationship, which had been that Waste Connections was a general contractor paying its subcontractor $165 per hall. Are you saying they agreed to continue the $165 or are you saying they didn't agree? We are saying that they agreed to pay Metro $165 per hall for the halls that were actually performed by Metro as part of an at-will arrangement. Okay, so you're saying they agreed to that in the new contract? If there was a new contract, at most it was an at-will contract. Well, there's two questions, right? There could be a new contract with a missing price or there could just be no new contract. Yes, Your Honor. We would submit there was no missing price because the party's conduct from 2014 through September of 2020 showed that they were both operating at this $165 price. In fact, Metro was the one submitting invoices to Waste Connections at $165. Fair enough. That sounds like an argument for, yes, a new contract and at the same price. Correct. And the key admission from Metro here, their CEO, Jimmy Woods, was, I don't think we ever obviously had an agreement on a rate increase. The testimony below was very consistent that Metro asked for a new contract. They asked that a rate increase be part of that new contract. Waste Connections said, we're working on it, we're passing it up the chain. That never got a new contract. In the meantime, the parties agreed, we'll continue our current relationship. Well, what the district court said was the evidence suggested that what Waste Connections was doing was basically giving them the hand, not giving them a new contract, and then just keeping the profits for themselves. That Waste, I guess, I'm going to get confused, Metro Services was asking for the new rate and there's a CPI in the, I thought the original contract, right? Correct. So the district court, in assessing the post-trial motions, basically assessed the evidence a little bit differently. And Judge Wilson, that goes to the tactical decisions at trial that Metro made. They made the tactical decision to present this as a breach of contract case with breach of contract damages. What you're referencing, this idea that Waste Connections was stringing them along, that they said a contract would come, but it never came. Well, they did say that. You're right, Your Honor. What was it, 10 years? You're right, Your Honor. How long did it take to write up a contract, especially when you had a prior one? What those conversations could plausibly constitute would be a detrimental reliance claim. The problem for Metro here is they never presented any evidence of damages for detrimental reliance. Louisiana law states that the damages are different from breach of contract. For detrimental reliance, you actually have to show evidence of, we incurred expenses based on this promise you made us. Here, for example, we spent a million dollars on new trash trucks because you told us a new contract was coming, and that never happened. The record is completely devoid of any damages evidence of that sort. And so, maybe they could have tried— There was evidence in the record, the district court detailed it in the post-trial order, that Metro services needed a higher rate, that that was what was always contemplated, that I guess the renewal of the contract was at a higher rate from Jefferson Parish, right? Not exactly, Your Honor. I'm misreading the district court's order, I guess, not an opinion, at the end where the court is grappling with the evidence on both counts. On this idea of a new rate, it is true that the parties were discussing a new rate and were discussing that that issue was being passed up the chain at Waste Connections. And the court grappled with the very quote where, I guess, Metro services said, yeah, there wasn't a new rate agreed to, or obviously we didn't reach agreement. And the district court dealt with that and said there was other evidence that the higher rate was contemplated. In other words, the district court found that there was evidence for the jury to say, yeah, it was supposed to be the 225. What the district court said in the order was, yeah, Metro said they never agreed to a new rate, but that doesn't necessarily mean the jury couldn't have concluded that, in fact, they did. We disagree with that. But to Judge Duncan's point, though, under Louisiana law, can't the jury fill in the price if the price is missing? The standard here, and we're dealing with an appeal of a denial of a motion for judgment of matter of law, is were the jury's findings supported by substantial evidence? And I think we view the evidence most favorably to the verdict, right? You are to look to see whether there's substantial evidence, which means could two reasonable people have differing conclusions as to the factual basis. I think one thing that's important. The answer to this question is yes. Yes, Your Honor. And I do want to build on that. I think the important part here is you're going to hear from Metro all about the credibility disputes that the jury resolved, and this court should not step in to infringe on those credibility determinations. There is not actually a factual dispute about what the parties were discussing, what communications were exchanged between the parties. The record is consistent from both sides. Metro asked for a new contract. Waste Connection said we're working on it. Waste Connection said, in the meantime, let's continue. Let's continue the relationship we had. Yes, Your Honor. That relationship wasn't an at-will employment, right, or engagement. You want it for a term with notice of termination provisions, all those things? What you're hitting on is whether let's continue means let's adopt the terms of the 2009 written subcommittee. I thought it was let's continue with our current relationship or something to that effect. That was, that's correct, Your Honor. You can't have that if it means, well, 165, and then disclaim it when it means not terminable at will for a particular term, definite term, all those kinds of things. In other words, if it's a current relationship, how do you square that? You don't get to pick and choose the terms Waste Connection likes, the current relationship. We would also submit that Metro doesn't get to say, well, they said continue the current relationship, except we wanted a new price. Did the prior contract have a CPI adjustment provision? Excuse me, Your Honor? The contract that existed prior to the renewal, did it have a CPI adjustment provision, like a rate adjustment? A 2009 written subcontract provided for a rate of 165 plus CPI adjustments. That's correct, Your Honor. Was the CPI ever given? No, Your Honor. It was never given. Is there evidence in the record as to whether 225 is a market rate? There is evidence to that effect. There was contrasting evidence that 225 was based off of a different job that had different circumstances. Again, this goes back to what we discussed earlier of, you don't get to the question of supplying a market rate unless there's a missing price, and based on the conduct of the parties over many years, there was not a missing price here. Under Louisiana law, in order for plaintiffs to prove an oral contract, they need the testimony of at least one witness and corroborating evidence. Now, the testimony from Metro was that Jimmy Woods felt like there should be a new duration for this new alleged oral agreement, and he felt like they deserved a new rate, but he never testified that anyone from Waste Connection said, we're agreeing to a new rate, or we're agreeing to a new duration. So we have to look at what the corroborating circumstances were, and we can look to the conversations and the conduct of the party. For the writings between the parties, there was no written agreement for the post-2013 relationship. Metro has pointed to emails from Waste Connection saying, we will continue our current relationship. On the oral representations, they've pointed to Waste Connection saying, we'll work on that new contract. In the meantime, we'll continue our current relationship. And in terms of the conduct, when you look at the conduct from 2014 through 2018, November of 2018, Metro is submitting invoices to Waste Connection with a price of $165. Waste Connection pays that rate. Metro continues to do the work, continues to send additional invoices at $165. It's not until November of 2018 that Metro submits its first invoice for $225. Waste Connection immediately rejects that rate, and then the parties for two more years continue to operate under this rate of $165. So the conduct certainly does not corroborate that they ever agreed to a new price or a new duration. The conduct also shows that Metro asked three dozen times for a new contract, and each time Waste Connection said, we're working on it. If anything that corroborates that Metro knew there wasn't a new contract yet, in the meantime, they continued to work under that $165 rate. I know there's a separate part that I hope you get to about damages evidence, exclusion of an expert. Correct, Your Honor. So I think one of the difficult questions in this case is, given that the parties agreed that there was never an agreement on that new price, that's reason enough for this court to conclude there's a defect in the verdict below. The harder question is, what should this court do about it? We see three options. The first would be a full reversal entry of a judgment of matter of law in favor of defendants finding that there was no contractual agreement post-2013 other than to pay Metro $165 for the jobs that they actually did. A second option would be a new trial, but a narrow one, on the issue of was there any contractual agreement post-2013, but the court holding judgment in favor of defendants that there was never an agreement on a new price and there was never an agreement on a new duration for that 2013 to end of 2023 period. The record below is a robust one, and we mentioned that there is not actually factual disputes about the communications. It's just a question of did those communications rise to the level of an oral agreement. And so we do think the court could enter judgment on those two issues, but issue a new trial on the narrow question of was there any agreement, such as was it $165 plus CPI for that at-will period after 2013. The final option would be to grant a new trial on the evidentiary issues, to hold that there were evidentiary errors below, grant a whole new trial. The errors below that you're asking about are the damages. Metro was awarded damages for about four years of future lost profits. That was based off of their experts' calculations of what the average amount of hauls that they had done historically. Waste Connections attempted to cross-examine both the plaintiff and the plaintiff's experts on whether they were actually equipped to do that number of hauls going forward, because there was well-publicized manpower and equipment shortages that Metro was having. The district court wouldn't allow it. The district court thought it was prejudicial. It clearly goes to damages, and the defendant's right to— You believe you had evidence that shows, well, they couldn't have done that number of hauls, therefore the damages should have been less. Correct. At least the jury should have had that before. That's the evidence that we had, and we were not allowed to explore that issue. There is a proffer from defendant's witnesses showing Metro could not keep up with the work, and we had to step in. I was going to ask about a proffer that's in the record, so we can look at the evidence. That is in the record. I'll get that cite to you later, but the proffer is in the record. What is not in the record, because Waste Connections was not allowed to put it in the record, is the cross-examination of plaintiff. You were having manpower shortages in 2020, isn't that right? You were having trouble keeping up with your work in 2020, isn't that right? We were not allowed to ask those questions, and they clearly go to damages. The other evidentiary issue was the speculation over— Let me ask you this. Were both sides allowed to put in expert evidence as to damages? Keeping to one side this excluded testimony, did you both have experts? They were both damages experts. The objection is that plaintiff's damages experts, it essentially went unrebutted because we were not allowed to probe into whether that number was— You had your own expert. Yes, Your Honor. We did. I do want to hit on this issue of the same terms and conditions email, because that was another evidentiary issue that really tainted this trial for the defendants. When we talk about corroborating evidence, one of the chief pieces of corroborating evidence that Metro tried to rely on is, well, Waste Connection said, same terms and conditions as before will apply. That was never communicated to Metro. There is nothing in the record showing that that email was ever sent to Metro. Metro never testified that they were ever told that. The district court did allow rank speculation from a third party who was not part of that to say, yeah, I think that was probably forwarded to Metro based on the party's past relationship. He did not have personal knowledge of that. We timely objected. The district court overruled it. And then Metro spent their entire closing argument saying, you heard, Waste Connections told them same terms and conditions apply. It never happened. It's not in the record below. And so that's another basis for reversal. Thank you, counsel. You have time for rebuttal. Thank you. Mr. Zimmer? Sorry, I can't do it without water. May it please the court, Charles Zimmer on behalf of Metro Service Group. I'm going to go off script here and just address the point. Well, so how was the jury rational in finding a contract for 225 when the president of Metro Services said we can never grant a price? Very easily, actually. If you look at the definition of what is needed to form that contract, Louisiana Civil Code Article 1846 states that when a writing is not required by law, a contract not reduced to writing for a price or in the absence of price for a value not in excess of $500 on the form of contract. And that flows along the line of case law where the, especially in something like an oral contract, where it's always going to be a fight. If you're in court about an oral contract, somebody doesn't agree that there was a contract. Well, they didn't agree to have a written contract. Right. So the jury here was presented with a lot of evidence. And it's great to go, oh, he said there was no agreement. He's being perfectly honest. They never said, Jimmy, 225 it is. So here's what we presented and what the jury agreed with. They came to Jimmy Woods and said, you know, this was before he knew about the CPI issue. So they come to him in 2013, like, look, we've got to get this contract. We have a chance for a no-bid 10-year contract. As the district court raised, that raises its own problems because you're really not supposed to be able to do that. But somehow they did. Let's assume that that was all in the up and up, OK? So but they say, look, we need you. So they get into the agreement. And Jimmy says, look, I'm at 165 from 2009. This is not profitable for me. I need a new rate. And they're like, Jimmy, we're together. We're on it. We're on it. We're on it. We're on it. We're doing it. But you billed the old rate for, what, four years? Correct. And in that four-year period, how many emails and discussions do we have of him saying, where's the new contract? And they're like, oh, man, yep. But you billed the old rate for four years. You don't have? Is there any evidence that they tried to bill the 225 any time during that 2014 to 2018? 2018, they started billing it. November of 2018. I'm talking about prior to that. Prior to that, they did not bill. Four years. Four years, they kept doing bill because that was what they had. But there's nothing in the record that they were asking for it other than they were back and forth about where's our contract. Correct. Any evidence during that four-year period about the rate in particular? Not the rate in particular, although the testimony is very clear most of this was happening by telephone, that this was going back and forth by telephone. The emails were the rarity, not the norm for these two older gentlemen. So when they show up with 225 at the end, it ratifies what they had said from the beginning and that there were ongoing conversations the whole time. And when you see the emails continually popping up, it says, look, he's again asking. It's never like, hey, I got this random thing. And there's always a response, oh, yeah, we'll get to it. And I want to, there's a couple of things that counsel said that I think are very important. As he predicted, yes, I am talking about credibility because that is what we're here for. He said, we're going to use a current relationship and that's an at-will contract. That's fundamentally wrong. Those two things do not go together. The current relationship, which is a stipulated fact before trial. So this was not even a fight, okay? The stipulated fact that we will use a current relationship. That happened in 2013. 2013, you have a binding contract. And I went through extensively with Mr. Tom Martin. What is your relationship? They pick up some trash, we pay them. Okay, where do they dump it? Well, wherever the contract says. Well, you have to have insurance for your subs, right? Well, how do they know what insurance to get? Well, that's what the contract says. If they dump in your front yard, is that okay? Because there's no contract, right? How can they be in violation of a contract? No, no, no. Eventually, he's like, well, I mean, yes, the terms of the contract, yeah. This is just, frankly, nonsense. 165, let's say you are applying the terms of this contract. It's not 165 anymore. They admit in the stipulated facts, yeah, we collected the CPI increase. Their rate was 187 by that point, just applying the CPI increase. So if you're going to say legitimately and honestly to this court, we wanted to do the same terms and conditions as December 31st, 2013. Well, 165 is not that. 165 is you going, they still don't know about the CPI. That's what's going on. And at trial- Why didn't Metro Services bill it? I'm sorry? Why didn't they bill it? At the 225? 187, 225, anything other than 165. That's a question that they paid the damages for. How come they didn't update their stuff and his testimony was that they just trusted that it was going to get fixed and they didn't want to destroy the relationship? Where's any evidence of that belief, that it's going to get fixed? That's throughout his, I mean, the court even pointed out at some point, she pulled a sidebar and said, well, he's clearly, y'all didn't tell me before that they were worried they were going to take the contract from him if they pushed back. He's clearly has testified that now they were worried that if they pushed back, they were going to lose this contract. So that's all part- It would get fixed is sort of the back and forth about where's our contract? We're getting it to you, that- Right. And as a small company in this $213 million big piece that you don't really have the power to just go, hey, man, we're not picking stuff up. They'd be like, good, because guess what? Here's our internal emails that say, we're hoping we can take this from you. They pushed to get the contract using their relationships. Immediately, and it's at Exhibit 14, internally, Waste Connections is saying, you know what? We really need to get rid of Metro. They don't have a contract and we can take this and we can get $120,000 a month in profit. So that was as soon as they started this relationship. Internally, they're saying, well, how do we get it from them? And you have the two border law- not related, but two border law witnesses in Waste Connections going, that's a bad idea. We got this contract a lot because of their relationships. They're a local small business. Don't go and try and take them for this little bit of profit. And they say that, oh, well, that died on the vine. Don't worry about it. It all fits exactly the credibility issue that's going on. They knew they had them. They had tricked them into getting them. They're telling the parish, sworn affidavits every month to get paid. Metro is our subcontractor. Not going, well, they're not really a subcontractor, but if they show up, we're going to give them $165 and no CPI increases. We don't know if they have insurance. We don't know any of this stuff. You know, but hey, they're still showing up. So we're still going to do it. And they shouldn't have, frankly. Just so I can understand, there was a written contract for a term. When was that term supposed to end? It ended with the contract, with the original prime contract. When Waste Connection gets the new one, then the new contract going forward, your theory is it's an oral contract, no longer a written contract. Not an amendment of the original contract, because that would have been forbidden. Correct. And that also cures the only error, an error, I think, of the trial court. The trial court in her 50B ruling said that you couldn't, this whole issue about applying the price, you couldn't do because they actually had a price, and that that case law doesn't apply to changing a price. And for that exact point, I think that was actually erroneous, because it's actually a stipulated fact. They did not amend the contract. But they could have amended the contract orally, right? They could not have amended orally, no. There was a provision in the contract that said it has to be in writing. Right. So here, they approach it as if it's so hard to comprehend what we're talking about. And it was one of the reasons, in closing, we just showed the jury a copy of the original contract, where it has multiple references to incorporate it by reference, just to let them see that it's not unusual for contracting parties to say, look, we have this little simple thing. We're going to incorporate this bigger thing over here so we all know what it is without restating it all. So the idea that you can't do that orally to go, look, we're going to redo that same contract, but we're going to change the, update the rates. It's not complicated. It's not hard to grasp. And it certainly cures all the problems that would occur of, well, what do we do with all these details that aren't there? Last question about that is, you billed 165, as we've discussed, for a certain number of years. You're not seeking damages for those years, right? The damages are for the three years, which was the prescriptive period for the open account, which goes back to, forgive me the date, but yes, all of the period was during the time of the 225 requested period. That period before they lost. Yeah, they're not getting 225 then. Right, right. They were getting 165. They were invoicing for 225. And then the future damage issues were at 225. Council mentioned multiple times that, you know, we're passing it up the chain. And they used the word meantime several times. Nowhere in the record is there a meantime. Jimmy, in the meantime, let's do this. Mr. Woods, we'll do this in the meantime. That is never, ever, ever said. Which is important because that would be a flag that, well, all right, so something's, you know, we're in a different state right now. Never said that. And they didn't say it before. They didn't say it after. And, you know, my client should have stood up sooner and said, you know, we're not picking up trash next week. But that would have then led to a termination under the contract. So they didn't have a lot of good options. And, unfortunately, they waited. And they lost millions of dollars because of it. Because they just gave up all the CPI increases and all of those underpayments for the period that was before three years from the date of filing the suit. The debt, there's this claim that there was a, it's a breach of contract case, not a detrimental reliance case. And the trial court pointed that out when they made the objection below that that was, frankly, nonsense. And the response from counsel was, well, that's what that's captioned. Right, yeah, it's captioned breach of contract. But we actually had a section for claims that stated, you know, other claims. So that one, I think, holds no water. The expenses for the detrimental reliance proof, the expenses do have to be proven. Here, you have an easy way to prove it because you have another way to replace it. So instead of going through the analysis of what is your normal profit margin expenses and all that stuff, it's a lot easier to go in and say, well, what is the rate you were supposed to get? What's the market rate versus your actual rate? So you cure that math without having to go through the analysis of it, of all the details. On the evidentiary issues, this is a, let's call it a red herring. I think we'd be giving it too much credit. The evidentiary issues were stemming from a motion in limine actually filed by Waste Connections, not by my client, Metro. So they proffered the evidence. And I would ask you to look. The average is expert? Yes. Well, and it's not just the expert. It's everything about the proffered evidence. So they say they were precluded from putting this evidence on. So they proffered it. The proffered evidence has nothing to do with an inability to do the work. They asked my client about, did you have problems doing the work? And it's at page 2448 of the record, where he asked Mr. Woods, did you have difficulty hauling in 2020? He's like, no, I wouldn't say that. He said, well, didn't the number go down? He says, yeah, we started cutting back when we realized we weren't getting paid. So this whole but-for world, OK, if you're going to say that we could not have done the work, you have to assume that is in the but-for world, were they getting paid the right rate? Was there testimony, any other evidence to the contrary from another source that they were struggling to do the work? There's one piece of proffered evidence where an internal Ways Connections email says, oh, we had to cover for Metro. They're not picking up. And again, in that time period that the email's in, it fits with what my client is saying. It's like, yeah, at the end of this relationship, after we're billing 225, and you're not paying it, and this thing is really starting to fall apart, you know, we're not allocating resources to an unprofitable project anymore, which, again, fit with what Ways Connections wanted, because they wanted the work the whole time. And that's the only one. So in their position, that doesn't go to damages? The jury could certainly look at it. You know, I wouldn't, we didn't move to strike that evidence. So let's say the jury saw one internal email going, we have one example, or let's say one week, let's say one month, of Metro not picking up all the time they're supposed to. The rest of the evidence is all about complaints. And that's what the judge actually struck. She made very clear pre-trial, and it's on the record, you can talk about their inability to perform. You can ask those questions. All of the evidence you're trying to put in is saying they did bad work. And the judge correctly said that's irrelevant, because there's only two theories. If there's no contract, as you proclaim on one hand, you could fire them because it's Tuesday. So it doesn't matter if they're doing good or bad work. You could fire them if they have no damages. What we're actually reviewing is an evidentiary ruling for abusive discretion. I mean, the district court said I'm not putting this in. It's unfairly prejudicial. She said that it was irrelevant and potentially presidential to both sides, because it meant that all the evidence came in, ours and theirs. Ours was monthly 10, 20, 30, 40, $50,000 fines from the city against waste connections for bad work. Now, they're going to look at Metro and go, oh, your work's not good enough. Hold on. None of these say Metro. She didn't want any of that in. She did not want any of that in, because it did not go to their ability to haul. It went to the theory we were going to fire them anyway. And as the court pointed out, if the contract applies, again, because that's the world you're in where termination is irrelevant. So if you're trying to say I was going to fire them because they did bad work, well, you never gave them notice and a cure period. So that doesn't make any sense. Why am I going to let you tell the jury they're doing bad work when you never actually tried to terminate them? And their witness on the proffer, it was great, because they start going through this stuff and they have all these complaints. I'm like, well, this complaint about trash on the ground, does Metro pick up the trash off the ground? No, no, actually, that's us. They just hauled it. Well, this complaint about the guy at the front gate, is that a Metro guy? No, no, that's not. We go through all this. Most of it is not, almost none of it is about Metro. Most of it is about waste connections at that facility. Metro's role there was just to grab the trucks and leave. In any event, we can see this, right? It's in the proffer? It is in the proffer, yes. And I would, I think the proffer is strangely useful in this, because it shows, one, that the judge was right in her evidentiary ruling that it wasn't relevant. At the same time, it destroys their argument that, well, if we'd have had this, we could have examined their expert differently. They examined the expert with all the evidence they had about the inability to do the work. And you know what the evidence was? Here's the history of hauls. Would you agree it goes down? He's like, yes. It's like, did you take that into account? Yes, it's an average. So it's included in there. That's the end of their questioning. They go on. And the reason is because they've got nothing else. Their own expert presented no opinion about an alternative theory. Why? The expert's reports were done from discovery. It had nothing to do with the judge's ruling on the motion to eliminate. They had developed no evidence throughout discovery of an inability to do the work. At trial, the testimony was, no, we could do the work. We just stopped doing it when we realized we were never going to get paid. Now they come and say, oh, we were precluded from asking that question. It's simply not true. If you read the testimony, the statement that the judge stopped them from asking these questions is inaccurate. You read it, they ask the questions, and they stop. There's only one time where the judge stopped the examination, and that was based on an objection where the question was, are you reasonably certain about your expert calculation of future damages? I objected that that gave the wrong impression because the case law said reasonable certainty is the same as a preponderance. But by using that term, which has not been explained to the jury yet, it would be confusing. That objection was upheld or sustained. Counsel then said, OK, moving on. The judge didn't tell counsel, you are not allowed to ask any questions about that. And it's specifically just the opposite instruction was given before trial where there was a lengthy discussion about the then-recent motion in limine what it meant and what counsel was allowed to do. And the district court made very clear, you're allowed to attack their inability to do the work. I'm not letting you talk about them doing bad work. And that's where I think what happens on appeal, you get someone looking at it and saying, well, jury verdicts need to be protected, so let me find the sliver of argument. The problem is the testimony and the actual examination, the actual rulings don't line up with that argument. You know, it's a nice technicality, but getting to the meat underneath it, it's not there. Again, their expert presented no evidence for the jury to make a different opinion from. The jury was left with Metro's version of future damages or accept that there was no future damages. And was the jury entitled, were there two different scenarios presented through the expert's testimony? There were. There were, I guess, technically four scenarios if you count both sides' experts. Each expert gave two scenarios, depending on whether or not you use the 165 rate or you use the 225 rate, so that the jury was allowed to say, is there an agreement to 225 or not? The difference of the experts in that was that our experts used the forward period all the way through the end, whereas theirs said, the day we stop doing business with you is the day all your damage is in. And the two experts actually complemented each other. You know, we're using the same theories. We use the same numbers. Everything's the same except for what the assumption is, which, of course, is the providence of the jury to go, well, we're picking which assumption. The jury came back and said, you know, can we see these? We all agreed that they could look at the numbers. And they chose to use the scenario that corresponded with an agreement or detrimental reliance on the belief there was an agreement at the 225 rate all the way through the end, which was the maximum damage period. And there was an error that came up. I only pointed it out because I didn't want the expert to eat it. The expert calculated it based on the date stated in the contract, which turned out to be 11 years. The actual contract says on the front it's for 10 years. And by law, it's supposed to be 10 years. So I didn't want to leave him hanging that he had done the calculation wrong. He did it right based on what the contract said. We all agreed that it should be limited to 10. So they adjusted the jury voting downwards. And the issue, finally, about the letting one man potentially, let's say he speculated that they saw this. If you look at exhibits that were in the case, which is, anyway, if you look at the exhibits, you'll see that this was repeated so often and so frequently that one email or that one exchange had nothing to do with it. It's a stipulated fact that it was the same terms and conditions. So to complain that they heard, you know, I mean, the current relationship to go, oh, but if they heard terms and conditions, that changes everything. Current relationship, terms and conditions, let's assume that he didn't hear that. It wouldn't change anything. Thank you for your time. Mr. O'Mim, do you have five minutes for rebuttal? Thank you, Your Honor. We spent a lot of time talking about the evidentiary issues. I'm going to give you just a couple brief record sites, and then I think we should move on to what is the heart of the issue here. Mr. Zimmer mentioned that the trial court didn't actually preclude us from presenting the manpower shortages issues. I would just direct the court to page 2246, 2500, 2708, and then our proffer begins at 2724 at the conclusion of which the judge again said, no, I'm not going to allow that. 2500 is specifically where we attempted to cross-examine Jimmy Woods. You were having equipment and manpower shortages. Those would have continued into the future, right? We weren't allowed to touch that. So that really demonstrates the issue on the damages. What I think is the heart of this case, and it goes to why this is an important case for businesses going forward and having certainty with their contracting going forward, the court is faced with the question of when a subcontractor unilaterally believes that the parties agreed to a rate increase and agreed to an amended duration, but the only corroborating evidence is the general contractor saying, we will continue the existing relationship. Is that sufficient corroboration to warrant not just a continuance of the prior relationship, but amendments to price and duration that the sub unilaterally desires? The answer is no. That's dictated by the Reed v. Wilwood case, Louisiana Supreme Court, 2015. That's where the court said, yes, there was an oral agreement as to an employment contract, but we have to look at the key terms. And the key term there was duration. And they said, even though there was an oral agreement to an employment contract, there was not sufficient corroboration on duration, and therefore it was an at-will contract. We're dealing with the same sort of situation here. We have to look at whether there was corroborating circumstances, not just to a relationship generally, but to new price, new duration. Metro's essentially asking for this de minimis standard that, well, if there's corroboration that they were going to keep going, then if we unilaterally say we understood that to mean the price we wanted and the duration we wanted, then we've got corroboration. That's not what Reed says, and that's not what this court should hold. I want to get back, Judge Wilson, on this issue of current relationship, that did that mean an at-will arrangement? The way we get there is Louisiana law says if you've got a contract without a set duration or with a nonsensical duration, then we supply at-will. The sort— Was Waste Connections' contract with the parish of an unlimited duration? So, and that's what I'm getting to here— In the 10 years? It was not a 10-year duration. So the 2008 prime contract that Waste Connections had with the parish was a five-year contract with a five-year option. The 2009 subcontract agreement with Metro said this will track the term of the 2008 prime contract. When that expires, the subcontract expires. Now, Metro would like for we'll continue our relationship to mean the new subcontract is going to track the duration of the 2014 prime contract that Waste Connections has with the parish. Yeah, but the secret to the sauce in the prime contract, the 10-year prime contract, no-bid contract, was continuing the relationship you had with Metro Services, right? No, Your Honor, I would just— No evidence about that? About how we want to keep our relationship going and we feel like that's an important part of getting this deal? There's evidence that Metro helped Waste Connections get that contract. There is evidence of that, Your Honor. But on this idea of a new duration, that the new subcontract was going to have a 10-year duration, that it was going to track the 2014 prime contract that Waste Connections had with the parish, that is not supported by the record. Metro's own witnesses never said, that's what Waste Connections told us. That's not in the record. You don't think a jury could rationally have come to that conclusion? Not based off of continue our current relationship. Was that what was argued to the jury? What was argued to the jury is that the same terms and conditions would apply, that being the 2009 subcontract. But even if that were true, that the 2009 subcontract would apply going forward, the duration of that is tied to an old contract that's expired. So it's this ambiguous duration, and Louisiana law says we supply at will. This case has two sophisticated businesses that know there is a risk to doing business without a written contract. One of those risks is if you're a struggling subcontractor and you can't get the job done, the general contractor doesn't have to stick with you, especially when they owe duties to Jefferson Parish. Waste Connections moved on because Metro wasn't getting the job done and there was no contract in place. Thank you, counsel, for a well-argued case on both sides. The matter is under submission, and that concludes the work of this panel this week, and we stand in. We're adjourned.